IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2024

**STATE OF TENNESSEE v. TERRANCE COLLINS**

**Appeal from the Criminal Court for Shelby County**
**Nos. 20-00918, C2001775      Carlyn L. Addison, Judge**

———————————————————

**No. W2023-01150-CCA-R3-CD**

———————————————————

Terrance Collins ("Defendant") appeals from his Shelby County Criminal Court conviction for aggravated arson, a Class A felony, and resulting twenty-year sentence. Defendant contends that the evidence was insufficient to support his conviction and that the trial court abused its discretion by imposing more than the minimum in-range sentence. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Paul K. Guibao (on appeal) and John L. Dolan (at trial), Memphis, Tennessee, for the appellant, Terrance Collins.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Venecia Patterson and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This case arises from a November 13, 2019 fire at the home of Jessica Teel in Memphis. The May 2020 term of the Shelby County Grand Jury indicted Defendant for aggravated arson in connection with the fire. *See* Tenn. Code Ann. §§ 39-14-301, -302 (2019).

At trial, Ms. Teel testified that Defendant was the father of her ten-year-old child. She stated that, on November 13, 2019, she was at home asleep when Defendant called her and asked for twenty dollars. When Ms. Teel declined, Defendant told her that he was going to come over, and she told him not to come to the house. Ms. Teel said that she saw Defendant at the front door and that he banged on the door and tried to kick it in. Ms. Teel told Defendant to leave and pushed a bookshelf in front of the door. Defendant did not leave, and Ms. Teel retrieved her phone and called her then-boyfriend.

Ms. Teel testified that she saw Defendant through a side window "walking toward the fence to [her] back yard." The evidence at trial indicated that the house's back door led into the kitchen. Ms. Teel stated that, although she did not see Defendant in the back yard, she heard him; she noted that he said, "[Y]ou know I don't give a f--k, you know how I get down." Ms. Teel said that a "few seconds" passed between the time she saw Defendant walking toward the back yard and when he heard his voice.

Ms. Teel testified that she smelled lighter fluid and saw smoke "coming from the light switch by [her] back door." Ms. Teel tried to throw water on it, which did not help; at that point, she saw flames and smoke coming from underneath the door. Ms. Teel called 911, collected her dog, and left the house. Ms. Teel stated that a bottle of lighter fluid was found at the house near her grill.

Although Ms. Teel did not see Defendant when she exited her house, thirty to forty-five minutes later, Ms. Teel saw Defendant at a corner store "four houses down" as she was speaking to the fire investigator in the fire investigator's truck. Ms. Teel stated that Defendant was "looking down at everything going on." Ms. Teel said that she told the fire investigator "that he was standing right there and . . . not to make a big scene" but that, by the time the fire investigator "went down there," Defendant had left.

Ms. Teel denied that she gave Defendant permission to set the house on fire. Ms. Teel stated that, around 4:15 p.m. on the day prior to her testimony, Defendant called her and told her that she "didn't have to" come to court and that she hung up on him.

On cross-examination, Ms. Teel testified that she had known Defendant for three or four years before their child was born and that they had cohabitated intermittently. Ms. Teel acknowledged that Defendant had used drugs when they had lived together and that she had used drugs with him.

Ms. Teel testified that Defendant was alone when she saw him on November 13, 2019, and that no one else was present when she looked out of the window. She acknowledged, though, that she could not see all sides of the house through the front

- 2 -

window and side window and that she could not be "100 percent" certain whether someone else might have been present.

Ms. Teel testified that, Defendant could have been closer than four houses away when she saw Defendant at the corner store after the fire. Ms. Teel agreed that the front of the corner store was not visible from her house. She stated that Defendant was standing at the corner store's side and that she was "on the opposite side of [her] house" sitting in the fire investigator's truck. Ms. Teel did not remember what Defendant was wearing. Ms. Teel said that she alerted the fire investigator to Defendant's presence. She agreed that this incident occurred around noon and that it was not raining. Ms. Teel stated that the fire investigator told a police officer that Defendant was at the corner store, but Defendant was not there when officers arrived.

Ms. Teel denied that she had visited Defendant and asked him for money after the incident and added that Defendant never had any money. She stated that she had not visited Defendant since the fire occurred. Ms. Teel testified that, when Defendant called her the previous day, she told him that she had to "do this" and that she became angry and hung up the phone.

On redirect examination, Ms. Teel testified that, when Defendant came to the house, she did not see anyone else when she looked out the front door. Similarly, she did not see anyone else when she saw Defendant walk by her side window, and she did not hear anyone else's voice at any time during the incident.

Kenneth Clark testified that he owned the house Ms. Teel rented and that, on November 13, 2019, he received a telephone call that the rental house was on fire. He left work, and he and "[his] crew" went to the house. The fire department, police, and Ms. Teel were present. A firefighter walked with Mr. Clark to the back of the house, which was "tore up and burnt." Mr. Clark stated that "they had had to tear off the back porch awning and then the back door was burnt and all the vinyl siding around it was burnt." He added that the fire department had torn out the kitchen ceiling "making sure there was no more fire[.]"

Mr. Clark testified that his insurance company sent an itemized estimate reflecting $7,229 in damage. Mr. Clark stated that he made repairs to the property anytime Ms. Teel requested them, that Ms. Teel had a small barbeque grill on the back porch, and that sometimes there was "lighter fluid right there beside it[.]" Mr. Clark did not give Defendant permission to burn the house; he noted that he had never heard of Defendant until he received the police report.

Former[1] Memphis Police Officer Collin Bueltemann testified that he responded to Ms. Teel's house to block traffic while the fire department put out the fire. When Officer Bueltemann arrived, he saw multiple fire engines working to put out the fire and "a lot of smoke." After the fire department "handled" the fire, he spoke to Ms. Teel and took photographs. Officer Bueltemann stated that the photographs depicted the damage caused by the fire, as well as damage the fire department caused while putting out the fire.

Officer Bueltemann's photographs were received as exhibits and showed the open back door of the house and an adjacent small window, as well as some white siding. The door had soot at the bottom, and the area between the doorframe and the window was burnt, as well as the area above the window below the roof. The siding and wall beneath the window were missing, and debris was hanging from the edge of the roof above the window. A close-up photograph of the bottom of the door showed soot on its bottom half, with more concentrated soot along the bottom edge. Another photograph showed siding peeled back from underneath the small window; charred wood and soot were visible. Photographs of the back door and window from inside the kitchen showed that the wall between the door frame and the window was missing a vertical strip with soot on either side; the back yard was visible through the gap. There were also sizeable holes in the wall beneath and above the left side of the window, both of which had soot around them.

Memphis Fire Department Investigator Darin Leake, an expert in fire investigation, testified that he was called to Ms. Teel's house in November 13, 2019, after the firefighters determined that the fire was a possible arson. After speaking to firefighters on scene, Investigator Leake photographed the house's exterior, including fire damage to the house. The photographs were received as exhibits and were consistent with Officer Bueltemann's photographs. Investigator Leake testified that the back of the house had "a lot of fire damage to the bottom section of the door on the exterior side and the fire traveled up the side of the door, up into the roof area[;] here we had extensive damage to the roof area as well as the bottom portion of the door." Investigator Leake opined that the fire was started outside at the bottom of the back door, where the most damage was visible. Investigator Leake stated that the fire "burn[ed] through the door . . . and you can see on the studs here, . . . this did travel inside the house and the bottom portion up under the window[.]" He noted that there was "extensive damage" and that the fire went from the point of origin "up the side of the door to the roof area and . . . this section . . . was burn[ed] out." Relative to the siding that had been pulled away from the house, Investigator Leake stated that the firefighters were checking to make sure no fire was "trapped" in that part of the house.

Investigator Leake testified that the first fire damage visible inside the house was in the kitchen. He said that the fire "burn[ed] through the door . . . and . . . was coming inside

_____

[1] Officer Bueltemann testified that he worked for the Bartlett Police Department at the time of trial.

the house from the bottom portion . . . all the way up." Investigator Leake said the firefighters pulled down the kitchen ceiling to verify that no fire had entered the interior roof. Investigator Leake stated that the interior photographs of the back door showed "where the fire was trying to get in" through the door frame. A final photograph showed a barbeque grill grate and a white bottle with a red lid, which he identified as lighter fluid, in the back yard.

Investigator Leake stated that he took samples of the door frame and sent it to the Tennessee Bureau of Investigation (TBI) to be tested. Investigator Leake stated that lighter fluid does not leave an odor after it burns. He said that, in his experience, if lighter fluid was used as an accelerant in a fire, laboratory testing did not "find anything" most of the time. He noted that lighter fluid dissipated and that it would be diluted by water used to put out a fire. Investigator Leake testified that, after he spoke to Ms. Teel, he determined that the fire was intentionally set.

On cross-examination, Investigator Leake testified that the photograph of the lighter fluid bottle showed it on the ground as he found it, near a barbeque grill. He agreed that lighter fluid was commonly kept outside near a barbeque grill.

TBI special agent forensic scientist Paige Yawn, an expert in fire debris analysis and microanalysis, testified that she tested the samples in this case for ignitable liquid and that the result was negative. Agent Yawn stated that it was "not uncommon for us to get a negative result," and she explained that negative results could occur when no accelerant was used or when the ignitable liquid had evaporated during the fire. She noted that evaporation was "very common" in "lighter fluids that have a tendency to easily evaporate especially when exposed to heat such as in a fire." Agent Yawn stated that it was unsurprising that lighter fluid would be gone by the time a sample was collected. She agreed that it was possible for an ignitable liquid to be diluted by firefighters' efforts to put out a fire with water. Agent Yawn's report noted that a negative result "does not eliminate the possibility that an ignitable liquid was used."

After the close of the State's evidence, Defendant declined to testify and presented no proof. The jury convicted Defendant as charged.

Before the sentencing hearing, the trial court ordered the preparation of a presentence report and added a specific request for mental health history. Defendant filed a written request for the following mitigating factors: (1) Defendant's criminal conduct neither caused nor threatened serious bodily injury; (2) Defendant acted under strong provocation; (3) Defendant, because of youth, lacked substantial judgment in committing the offense; (4) Defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense; (5) Defendant, although guilty,

committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; (6) Defendant acted under duress; and (8) that Defendant's "social history" reflected limited education and work history which, "when coupled with his consistent and habitual drug use, rendered the normal and expected behavioral guidelines effectively nonexistent" and that Defendant's "social and even criminal behavior was the natural and normal product of his social development." *See* Tenn. Code Ann. § 40-35-113(1), (2), (6), (8), (11), (12), (13). The State filed a notice that it would request the trial court to apply enhancement factor (1), that Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate sentencing range; and factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high.

At the sentencing hearing, the State noted that Defendant had prior convictions for Class E felony "possession of drugs and unlawful possession of a weapon," as well as a conviction for "reckless aggravated assault" in 2014, and two 2018 misdemeanor convictions.[2] The State requested that the trial court apply enhancement factor (1), that Defendant had a previous history of criminal convictions and behavior in addition to that necessary to establish his range. The State also requested that the trial court apply enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high. The State noted that Ms. Teel was inside the house at the time the fire was set and that she was at risk of injury due to the flames or smoke. The State recommended a sentence of twenty years.

Defendant responded that there was one "actual victim," Ms. Teel, but that Mr. Clark was also a victim. He argued that "with the minimal damage that was done to the property, although there was some potential actual risk to life, there was no actual risk in terms of how it all played itself out." Defendant submitted that "[t]his was an anger issue within a domestic relationship" that could have "very easily, but for the consequences, had been in the nature of an aggravated vandalism or some type of property damage." Defendant noted that he remained in touch with Ms. Teel through his family. Defendant requested the minimum in-range sentence and for the court to consider the mitigating factors.

The State responded that, apart from "perhaps the mental and physical condition factor, which is number [(8)]," no mitigating factors applied. The State noted that the evidence at trial did not reflect any strong provocation; that Defendant was not so young

---

[2] Although the presentence report was not exhibited to the sentencing hearing, the State's pretrial "notice of impeachment convictions" pursuant to Tennessee Rule of Evidence 609 reflected that Defendant had March 31, 2014 convictions for possession of marijuana with the intent to manufacture/deliver/sell, a Class E felony, and reckless aggravated assault, a Class D felony.

that it mitigated the offense; and that "there was no one forcing him to go over and demand money and then set the house on fire when he didn't receive it."

After a brief recess, the trial court sentenced Defendant, as follows:

> Having reviewed the presentence report, provided by the Tennessee Department of Correction, it does appear as though [Defendant] has had at least two felony convictions as indicated by the State. He's had quite a bit of contact with law enforcement over the last few years.
>
> And while [defense counsel] would have us believe that a mitigating factor is of his youth, this report reflects that [Defendant] is currently 32 years of age and at the time of the event would have been almost 30. He was indicted in 2020.
>
> [D]efendant does have a previous history of criminal convictions and criminal behavior under the enhancement factors of section one. And he had no hesitation about committing a crime when the risk of human life was high. He was aware, based on the witness testimony, that the house was inhabited at that time by Ms. [Teel] when she failed to provide him with money.
>
> We heard from the experts and fire investigators who walked us through [the fire's burn] pattern, lighter fluid, the grill, and the Special Agent Forensic Scientist with TBI. Given all the things that we learned during that process, I hereby sentence [Defendant] to 20 years in the Department of Correction[] to be served as a range one offender.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant contends that evidence is insufficient to support his conviction, arguing that the victim only looked through the side window and saw Defendant walking toward the back yard but did not see him there, although she heard him; that the victim was not "100 percent" certain Defendant was alone; that Defendant was not at the corner store when officers arrived there, contrary to the victim's report; that Defendant was not seen "specifically causing the fire or directly in the vicinity of the door where the fire occurred"; and that "testing was inconclusive as to the origins of the fire." The State responds that the evidence was sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

A person commits arson who, in relevant part, "knowingly damages any structure by means of a fire . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein[.]" Tenn. Code Ann. § 39-14-301(a)(1) (2019). Arson is elevated to aggravated arson when one or more people are inside the damaged structure. Tenn. Code Ann. § 39-14-302(a)(1) (2019). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

When viewed in the light most favorable to the State, the evidence presented at trial shows that, when Ms. Teel refused to give Defendant twenty dollars, he banged on the front door of her residence and tried to kick in the door. After Ms. Teel barricaded the front and back doors, she looked out of a side window and saw Defendant walk toward the fence to the back yard. Although Ms. Teel did not see Defendant in the back yard, a few seconds after he passed the side window, she heard him in the back yard. He stated, "[Y]ou know I don't give a f--k, you know how I get down." Ms. Teel testified that she smelled lighter fluid, that she saw smoke coming from the light switch by the back door, and that she saw flames and smoke coming from underneath the back door. Ms. Teel stated that she kept a bottle of lighter fluid with the barbeque grill "on the side of [her] house," and Investigator Leake found a bottle of lighter fluid at the scene. Ms. Teel testified that the only person she saw and heard outside her home was Defendant. Although a sample of the door frame tested negative for accelerants, Investigator Leake and Agent Yawn both

testified that it was common for an accelerant like lighter fluid to have fully evaporated during the fire or for it to have been diluted by water during the firefighting efforts. Mr. Clark and Ms. Teel both testified that they did not give Defendant permission to set the house on fire. The photographs of the house reflected the amount of damage caused by the fire and the firefighting efforts, and Mr. Clark's insurer estimated that more than $7,000 in damage occurred. The evidence was sufficient for a rational jury to find that Defendant knowingly set fire to Ms. Teel's house while she was inside, without her or Mr. Clark's permission.

To the extent Defendant disputes Ms. Teel's credibility by arguing that officers did not find Defendant at the corner store, we note that it was the province of the jury to accredit Ms. Teel's testimony, and we will not disturb its determinations on appeal. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief.

## B. Sentencing

Defendant contends that the trial court abused its discretion by applying two enhancement factors to impose more than the minimum sentence. Regarding the trial court's application of the enhancement factor that Defendant had no hesitation about committing a crime when the risk to human life was high, Defendant argues:

> The facts, even in a light most favorable to the State, showed that the damage was minimal and that the victim [Ms.] Teel did not and was not at risk of serious bodily injury or death. This is clear from both the minimal damage and her ability to almost immediately leave the house (even attributing the time to retrieve her pet and move a previously placed piece of furniture from the front doorway). Further, there was no testimony to the scope or amount of smoke that could support use of this factor based upon the theory of potential injury or death based upon smoke inhalation.

Regarding the trial court's consideration of Defendant's previous history of criminal convictions and criminal behavior as an enhancement factor, Defendant argues only that "the trial court erred in using [Defendant's] criminal history as an enhancement factor based, in part, on the use of a previous reckless aggravated assault case."[3]

---

[3] Additionally, Defendant's brief states in its recitation of the standard of review, "If the reviewing court finds, as in this case, that the sentencing principles applicable to the facts and circumstances of the case were not considered by the trial judge, remand for re-sentencing is the appropriate relief. *State v. Wilkerson*, 905 S.W.2d 933, 935 (Tenn. 1995)." However, Defendant does not identify any sentencing purpose or principle violated by his sentence.

The State responds that the trial court did not abuse its discretion in sentencing. Relative to the risk to human life in enhancement factor (10), the State argues that the record supports the trial court's finding that the risk was high because Defendant set the fire knowing that Ms. Teel was inside and that the only other exit was barricaded. The State also argues that, although the trial court made no findings about risks to third parties, the record establishes that the lives of the responding firefighters were at risk. The State notes the extensive damage to the house and Officer Bueltemann's testimony that multiple fire engines were onsite and that firefighters were "actively trying to put out the fire." Relative to enhancement factor (1), the State argues that the trial court properly considered Defendant's two prior felony convictions.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2020); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n.33; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

The parties agreed that Defendant was a Range I standard offender. Aggravated arson is a Class A felony and has a sentencing range of fifteen to twenty-five years. Tenn. Code Ann. §§ 39-14-302(b); 40-35-112(a)(1).

We conclude that Defendant has not carried the burden of establishing that his sentence is improper. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Relative to Defendant's contention regarding enhancement factor (1), he fails to allege any reason why the trial court's consideration of his conviction for reckless aggravated assault was improper. *See* Tenn. R. App. P. 27(a)(7) (providing that an appellant's brief shall contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief"). Defendant has waived our consideration of this issue. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived in this court").

Defendant's next contention relates to the trial court's factual findings about the risk to Ms. Teel, which were based upon the testimony at trial. This court defers to the trial court as the finder of fact in sentencing. *State v. Erwin*, No. E2021-01232-CCA-R3-CD, 2022 WL 3355024, at *11 (Tenn. Crim. App. Aug. 15, 2022) (citing *State v. Parker*, 932 S.W.2d 945, 956 (Tenn. Crim. App. 1996)). The record supports the trial court's determination that Defendant knew Ms. Teel was inside the house when he set the fire after she refused to give him money.

However, our supreme court has previously held that the elements of aggravated arson include the risk to human life inherent in one person's being present in the fire-damaged structure and that enhancement factor (10) is appropriately applied when more than one victim is involved. *State v. Lewis*, 44 S.W.3d 501, 506 (Tenn. 2001). We disagree with the State's assertion that the facts at trial show that the responding firefighters' lives were put at risk. Although the value of the property damage was substantial, Investigator Leake testified that no fire damage was visible in the house until he reached the kitchen and that the fire had not damaged the roof area above the kitchen ceiling; accordingly, the fire damage was confined to the interior and exterior of one room. Officer Bueltemann testified that multiple fire engines responded to the fire and that he generally saw firefighters working to put it out. Nevertheless, no testimony established whether the

firefighters had to enter the home while it was actively burning or how long it took to control the fire. *Cf. Id.* at 506-07 (discussing that the record supported a finding that firefighters' lives were at risk for purposes of enhancement factor (10) when the fire marshal testified that he arrived to "heavy fire" in a building's second story, testimony indicated that firefighters "had actually entered the building while it burned" to ensure no one was left inside, it took forty-five minutes to bring the fire under control, and the fire destroyed the top half of a building). Therefore, enhancement factor (10) was erroneously applied in this case.

Nevertheless, even if the court's reasoning were faulty relative to both enhancement factors, mitigating and enhancement factors are advisory only, and erroneous application of enhancement and mitigating factors is no longer a basis to reverse a sentence. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 698, 704, 706; *Carter*, 254 S.W.3d at 346. Defendant has not established that his in-range sentence "wholly departed from the principles of the Sentencing Act." *Bise*, 380 S.W.3d at 706. Defendant is not entitled to relief.

## III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE